J-S53017-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: R.D.L., JR., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.A.D., MOTHER | : : : : : : | |
| | : | No. 2141 EDA 2019 |

Appeal from the Order Entered June 25, 2019
In the Court of Common Pleas of Northampton County
Orphans' Court at No.:  No. A2018-0040

| | | |
|---|---|---|
| IN THE INTEREST OF: R.A.L., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.A.D., MOTHER | : : : : : | |
| | : | No. 2142 EDA 2019 |

Appeal from the Order Entered June 25, 2019
In the Court of Common Pleas of Northampton County
Orphans' Court at No.:  A2018-0041

BEFORE:  OLSON, J., STABILE, J., and NICHOLS, J.

MEMORANDUM BY STABILE, J.:                **FILED DECEMBER 24, 2019**

M.A.D. ("Mother") appeals from the June 25, 2019 order involuntarily

terminating her parental rights to her son, R.D.L., Jr., born in July of 2008,

and her daughter, R.A.L., born in December of 2009 (collectively, "Children").[1]

Upon careful review, we affirm.

In its opinion accompanying the subject order, the orphans' court set forth its factual findings, which the testimonial evidence supports. Therefore, we adopt them herein. Orphans' Court Opinion, 6/25/19, at 1-10.

We reiterate those facts relevant to this disposition. In January of 2016, the Northampton County Department of Human Services, Children, Youth and Families Division ("Agency") received a referral that alleged Mother and Children were residing in senior housing with P.S. ("maternal grandmother"), that there was drug usage, and that Children had behavioral issues. N.T., 5/7/19, at 9. Upon investigation, the Agency learned that, by order agreed to by Mother and Father dated April 4, 2012, the maternal grandmother was granted sole legal and physical custody of Children, subject to partial custody and/or visitation of the natural parents, at such times and under such circumstances that the maternal grandmother deemed appropriate. *Id.* at 10-11; Petitioner's Exhibit 1.

The Agency opened services for Children and assisted the maternal grandmother in finding non-senior housing for Children and her. *Id.* at 10. The Agency provided services to help stabilize Children's behaviors. R.A.L.'s behavior included regressing into childish behaviors such as "baby talk" and

---

[1] The June 25, 2019 order also involuntarily terminated the parental rights of R.D.L. ("Father") to R.D.L., Jr., and R.A.L. Father did not appeal the order.

being uncomfortable around R.D.L., Jr. *Id.* at 41. R.D.L., Jr., had more serious behavioral problems, including, but not limited to, physical aggression toward the maternal grandmother. In addition, he suffers from encopresis, which involves fecal incontinence. *Id.* at 18-19.

At an unspecified time in 2016, Mother became incarcerated at State Correctional Institution ("SCI") – Muncy for crimes involving retail theft and criminal conspiracy, to which she pleaded guilty. *Id.* at 16; Petitioner's Exhibit 6. Mother was released from prison in February of 2018. However, Mother was re-incarcerated in April of 2018, for a subsequent crime involving retail theft. N.T., 5/8/19, at 76. Mother's minimum release date is the Fall of 2019, and her maximum release date is March of 2020. *Id.* at 9, 90.

In March of 2017, Children were removed from the maternal grandmother's custody due to her hospitalization for cardiac arrest, and they were placed in emergency physical custody. N.T., 5/7/19, at 12. Following a hearing on March 23, 2017, the juvenile court adjudicated Children dependent. The court established the goal of reunification of Children with either Mother, Father, or the maternal grandmother.[2] *Id.* at 24.

---

[2] The Agency established a visitation schedule for the maternal grandmother and Children in the maternal grandmother's home. In July of 2017, during a visit with Children, the maternal grandmother overdosed on heroin. N.T., 5/7/19, at 22-23. Upon her release from a substance abuse treatment facility, visitation resumed between the maternal grandmother and Children. *Id.* at 23. At a time unspecified in the record, the Agency stopped Children's visits with the maternal grandmother because they were having a negative effect on Children's behavior. N.T., 5/8/19, at 17-19.

Mother's Family Service Plan ("FSP") required that she participate in drug urine screens, a mental health evaluation and follow all recommendations, parenting education through JusticeWorks, and visitation with Children. The FSP also required that Mother maintain stable housing and income. *Id.* at 15-16.

Mother requested visits with Children at SCI-Muncy, and visits commenced on a monthly basis at the end of 2017. N.T., 5/7/19, at 27. When she was released from prison for approximately two months in 2018, Mother had five supervised visits with Children. *Id.* at 35-36. Mother's visits with Children at SCI-Muncy resumed upon her re-incarceration in April of 2018. The most recent visit prior to the subject proceeding occurred in January of 2019. *Id.* at 31-32.

Children were initially placed in the same foster home. *Id.* at 21-22. In December of 2017, the foster family requested that R.D.L., Jr., be moved due to his behavioral issues, so CYS moved him to a new foster placement. *Id.* at 22; N.T., 5/8/19, at 12-13. At a time unspecified in the record, R.D.L., Jr., was moved again due to his behavior of smearing feces all over that foster home. N.T., 5/8/19, at 13. By the time of the subject proceeding, R.D.L., Jr., had been returned to the same foster home as R.A.L., and his behavior had improved. *Id.* at 13-14; N.T., 5/7/19, at 59-60. The foster home is a pre-adoptive resource for Children. N.T., 5/8/19, at 19.

Since January of 2019, R.D.L., Jr., has participated in trauma-focused cognitive behavioral therapy. N.T., 5/7/19, at 55. In addition, R.D.L., Jr., and R.A.L. participate in therapy with a clinical social worker. *Id.* at 41-42.

On June 21, 2018, the Agency filed petitions for the involuntary termination of Mother's, Father's, and the presumptive father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). A hearing on the petitions occurred on May 7 and May 8, 2019, during which the Agency presented the testimony of its caseworkers, Kathleen Dilts and Sharon Brooks; Children's clinical social worker, Michael John Daniels; and R.D.L., Jr.'s, cognitive behavioral specialist, Tomeco Nash-Dais. Mother testified on her own behalf.[3]

By decree dated June 25, 2019, the orphans' court involuntarily terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b). On July 15, 2019, Mother timely filed separate notices of appeal for Children and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*. On July 22, 2019, the orphans' court filed a statement in lieu of a

---

[3] During the hearing, Children were represented by counsel, Barbara Baldo, Esquire, and Guardian *ad litem* ("GAL"), Henry Newton, Jr., Esquire. As such, the orphans' court complied with 23 Pa.C.S. § 2313(a), as interpreted by ***In re Adoption of L.B.M.***, 161 A.3d 172 (Pa. 2017), and ***In re T.S.***, 192 A.3d 1080 (Pa. 2018).

Rule 1925(a) opinion wherein it relied upon its opinion accompanying the decree.

Mother raises the following issues for our review:

A.     Whether the [orphans'] court erred in finding that Mother has evidenced a settled purpose of relinquishing parental claim to Children or has failed to perform her parental during without adequate explanation for her conduct?  ([Section] 2511(a)(1))

B.     Whether the [orphans'] court erred in finding that Mother has caused Children to be without essential parental care, control, or subsistence necessary for their physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by Mother?  ([Section] 2511(a)(2))

C.     Whether the [orphans'] court erred in finding that Children have been removed from [Mother] for a period of at least six months, and the conditions which led to the removal or placement of Children continue to exist, and Mother cannot or will not remedy those conditions within a reasonable period of time, and termination of parental rights best serves the needs and welfare of Children?  ([Section] 2511(a)(5))

D.     Whether the [orphans'] court erred in finding that Children have been removed from [Mother] for a period of at least twelve months, and the conditions which led to the removal or placement of Children continue to exist, and Mother cannot or will not remedy those conditions within a reasonable period of time, and termination of parental rights best serves the needs and welfare of Children?  ([Section] 2511(a)(8))

E.     Whether the [orphans'] court erred in finding that termination will meet the needs and welfare of Children? ([Section] 2511(b))

J-S53017-19

Mother's brief at 4-5.[4]

Our standard of review is abuse of discretion, as follows.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

_____

[4] With respect to Mother's first issue, we need not consider it because the orphans' court found that her conduct did not warrant termination under Section 2511(a)(1).

- 7 -

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Instantly, we conclude that the certified record supports the orders

pursuant to Section 2511(a)(2) and (b), which provide as follows.

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b); *see also In re B.L.W.*, 843 A.2d 380, 384 (Pa.

Super. 2004) (*en banc*) (stating that we need only agree with the trial court

as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm).[5]

This Court has explained that the moving party must produce clear and convincing evidence with respect to the following elements to terminate parental rights pursuant to Section 2511(a)(2): (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003).

Pursuant to Section 2511(a)(2), parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.* 797 A.2d 326, 340 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely

_____

[5] Based on this disposition, we need not consider Section 2511(a)(5) and (8). Nevertheless, we observe that termination under these subsections was not proper because Mother was incarcerated at the time of Children's placement. *See In re C.S.*, 761 A.2d 1197 (Pa. Super. 2000) (*en banc*) (stating that Section 2511(a)(5) and (8) did not provide a basis for terminating the father's parental rights when he was incarcerated at the time of the child's removal from the mother's care); *see also In re Z.P.*, 994 A.2d 1108 (Pa. Super. 2010) (same).

or disingenuous. *Id.* Further, the grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. *Id.* at 337.

In *In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012), our Supreme Court addressed the relevance of incarceration in termination decisions under Section 2511(a)(2). The *S.P.* Court held that "incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under [Section] 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied." *S.P.*, 47 A.3d at 828.

With respect to Section 2511(b), we have explained, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the

particular case." ***In re K.Z.S.***, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted).

In this case, with respect to Section 2511(a)(2), Mother asserts that she can and will remedy the conditions that led to the removal of Children because she "has developed insights into the causes of her behavior and what she must do to change." Mother's brief at 21. We discern no abuse of discretion by the court.

The documentary evidence reveals that Mother has a repeated and continued criminal history involving theft and criminal conspiracy from 2001, through April of 2018, and numerous probation and/or parole violations. Petitioner's Exhibit 6. In addition, Mother has a drug history. N.T., 5/8/19, at 25. In April of 2012, due to her incarceration, Mother gave legal and physical custody of Children, then two and three years old, to the maternal grandmother. The custody order memorializing this agreement remained in effect at the time of Children's adjudication. ***Id.*** at 85-86.

In 2016, after the Agency opened services for this family, Mother was incarcerated for a new retail theft crime, which, as best we can discern, was a probation violation for a similar crime she committed in 2015. Petitioner's Exhibit 6. When Children were adjudicated in March of 2017, Mother remained incarcerated at SCI-Muncy. Mother was released in February of 2018, but she committed another retail theft approximately two months later. Mother was sentenced to a term of incarceration with a minimum release date in the Fall

of 2019, and a maximum release date in March of 2020. N.T., 5/8/19, at 76, 90.

Based on the foregoing, we conclude that the Agency proved by clear and convincing evidence that Mother's repeated and continued incapacity due to incarceration throughout Children's lives has caused them to be without essential parental care, control, or subsistence necessary for their physical or mental well-being. In addition, Mother's repeated incarcerations cannot or will not be remedied. In this regard, we specifically discern no abuse of discretion by the court to the extent it deemed untimely or disingenuous Mother's claim that her incapacity will be remedied. Mother testified that her criminal behavior is due to her mental health problems, for which she is receiving treatment. N.T., 5/8/19, at 80. However, in documentation related to her guilty pleas in 2016, Mother acknowledged that she was receiving mental health treatment. Petitioner's Exhibit 6, at 204. Nevertheless, within two months of her release from prison, the record demonstrates that she again committed retail theft. Mother's issue on appeal with respect to Section 2511(a)(2) fails.

In her second issue, Mother asserts that the orphans' court abused its discretion in terminating her parental rights under Section 2511(b) because a bond exists between Children and her. We disagree.

We review this issue in light of the relevant case law, as follows.

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is

- 12 -

nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. *In re K.K.R.S.*, 958 A.2d 529, 533-536 (Pa. Super. 2008). The mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003). As we explained in *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010),

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

In considering the affection which a child may have for his or her natural parents, this Court has stated the following:

> [C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and its mental and

- 13 -

> emotional health than the coincidence of biological or natural parenthood.

***In re K.K.R.-S.***, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted).

Further, our Supreme Court has stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." ***In re T.S.M.***, ***supra*** at 268. The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." ***Id.*** at 269. The ***T.S.M.*** Court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." ***Id.***

In this case, the orphans' court found that Children do not have a strong emotional bond with Mother. Moreover, the court found that Children want to remain with their foster mother, who is meeting all of their needs. As such, the court determined that Children will not be negatively affected by the permanent severance of their relationship with Mother, and that their needs and welfare are best served by the involuntary termination of Mother's parental rights. Orphans' Court Opinion, 6/25/19, at 17-18. The testimonial evidence supports the court's findings, and its conclusion is reasonable based on those findings.

At the time of the subject proceeding, Children were nine and ten years old, and their prison visits with Mother continued. Throughout their dependencies, Mother's supervised visitation was appropriate in prison and while not incarcerated for two months in 2018. Nevertheless, Attorney Baldo, Children's legal counsel, stated on the record in open court prior to the testimonial evidence that she has spoken to Children who "have indicated to me that they would like to remain in the foster home. They would like to be adopted." N.T., 5/7/19, at 4-5.

Mr. Daniels, a clinical social worker, testified that he began weekly counseling with Children after Mother was re-incarcerated in April of 2018. *Id.* at 37-38. Mr. Daniels explained that Children were angry with Mother "for making a bad choice in behavior[], because they were very clear about why she was in jail." *Id.* at 38-39. He testified on cross-examination by Mother's counsel, that after her re-incarceration, "There was an increase in [R.D.L., Jr.]'s, encopretic behaviors and [R.A.L.]'s childish behaviors from what the foster mother told me. . . ." *Id.* at 44.

Mr. Daniels testified that, soon after Mother was re-incarcerated, R.A.L. "drew a very clear picture of what she considers to be her universe." *Id.* at 39, 44. He explained,

> In the center [of her drawing] are her brother and host adoptive family. Outside of that circle is her mother. Outside of that circle is her father. Outside of that circle is school and her grandparents. And outside of that circle is strangers.

*Id.* Mr. Daniels testified that R.A.L. is currently doing well in the foster home and "almost completely stopped any baby talk or childish behaviors. . . ." *Id.* at 41.

Mr. Daniels testified as follows on cross-examination by Mother's counsel regarding his report dated October 1, 2018.

> Q. And then I'm looking at the second paragraph which begins with, "[R.D.L., Jr.,] and [R.A.L.] have mixed feelings about [M]other, and [R.D.L., Jr.,] seems more connected to her." The second sentence says, "Neither child expressed an interest in returning to live with [M]other."
>
> Now, at that point, did they know where [M]other lived?
>
> A. They haven't known where [M]other would live in a long, long time.
>
> Q. And so is it possible, then, that [C]hildren are gravitating towards stability?
>
> A. Absolutely.
>
> Q. You go on to say . . . that [R.A.L.] has reported no interest in seeing or talking about [M]other[,] and [R.D.L., Jr.,] consistently is uncertain about his feelings.
>
> Do you find that strange, that [C]hildren wouldn't be comfortable talking about [M]other?
>
> A. I wouldn't say they weren't comfortable talking about it. They didn't want to because it caused them distress.

*Id.* at 45-46.

In January of 2019, rather than Mr. Daniels, R.D.L., Jr., began to receive treatment from Ms. Nash-Dais, a trauma-focused cognitive behavioral therapist, who treats him for post-traumatic stress disorder symptoms of

encopresis, anger, irritability, and mood swings. N.T., 5/7/19, at 55-56; Petitioner's Exhibit 2. Ms. Nash-Dais testified that R.D.L., Jr., has "had some significant progress" due to the discovery that his encopresis is, in part, caused by a medical condition, and treatment for the condition has helped. *Id.* at 57. Nevertheless, she testified that R.D.L., Jr., has "increased accidents" when he feels "fearfulness and [has] some racing thoughts regarding his permanency." *Id.* at 57-58.

With respect to R.D.L., Jr.'s, feelings toward Mother, Ms. Nash-Dais testified as follows:

Q. Has he talked about Mo[ther] or Dad specifically in your sessions?

A. I agree with the former counselor where [R.D.L., Jr.,] has some conflicting feelings between what he feels for his mom and dad. Whereas he feels a strong desire to maintain a family connection, he also has a strong desire and need for care and support in a permanent environment. So that conflicts . . . a child . . . because you expect that to come from your parents, but that's not where he's been receiving it thus far.

The care and his needs being cared for have been very inconsistent with his parents. But thus far in the foster home where he has exhibited some great improvements in his ability to manage his symptoms and his ability to process his thoughts and feelings, . . . he has been able to state that he loves his parents and he wants to be with his parents, but he is very, very concerned about his needs being met and being taken care of.

Q. Does he believe that those needs are being taken care of by [the foster mother] in the foster home?

A. He reports that consistently.

*Id.* a 59-60.

- 17 -

Thus, the testimonial and documentary evidence reveals that Children want and need permanency and stability. In addition, there is no record evidence of a parent-child bond between Mother and R.A.L. With respect to R.D.L., Jr., although he loves Mother, there is no evidence that a beneficial bond exists between them. Indeed, Mr. Daniels testified that Children have not expressed wanting to live with Mother, and their legal counsel stated that they wish to be adopted. Upon careful review, we discern no abuse of discretion by the orphans' court in concluding that involuntarily terminating Mother's parental rights serves the developmental, physical, and emotional needs and welfare of Children pursuant to Section 2511(b). Accordingly, we affirm the order involuntarily terminating Mother's parental rights to Children.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/24/19